**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

EDUCATIONAL CREDIT        )
MANAGEMENT CORPORATION,    )
                                 )
        Appellant,        )
v.                           )     Civil Action No. 3:14cv00864–HEH
                                 )
JENNY L. PULLEY,         )
                                 )
        Appellee.         )

**MEMORANDUM OPINION**
**(Affirming in Part, Vacating and Remanding in Part)**

This appeal from the United States Bankruptcy Court for the Eastern District of Virginia

(the "Bankruptcy Court") presents novel issues arising during the administration of a debtor's

Chapter 13 reorganization plan. Despite the unique factual setting, the underlying subject,

student loan debt, is not uncommon to bankruptcy litigation. Here, the student loan debtor is

Jenny L. Pulley ("Pulley") and the lender is Bank of America ("BoA"). ACS Educational

Services, Inc. ("ACS") serviced Pulley's student loans, and Educational Credit Management

Corporation ("ECMC") guaranteed the loans.

On October 4, 2006, Pulley filed a voluntary Chapter 13 petition in the Bankruptcy

Court. The Bankruptcy Court confirmed Pulley's Chapter 13 reorganization plan, which

included her student loans, on December 28, 2006. The confirmed 60-month reorganization plan

provided that all unsecured creditors, including BoA, were entitled to 71.81% of the debt

underlying their proof of claim.[1] During the administration of Pulley's confirmed plan, however,

---

[1] A proof of claim is simply a submission that establishes a creditor's "claim or interest" against the estate. *See* 11 U.S.C. § 502(a). As the Supreme Court stated in *United Student Aid Funds, Inc. v. Espinosa*, where a student loan debtor files a proof of claim regarding a debtor's student loan debt, it "submit[s] itself to the Bankruptcy Court's [equitable] jurisdiction with respect to that claim." 559 U.S. 260, 130 S. Ct. 1367, 176 L. Ed. 2d 158 (2010) (citation omitted).

ACS, the authorized agent for BoA's proof of claim, both refunded numerous payments sent by

Pulley's Trustee, and represented that it would no longer accept payments from Pulley's Trustee.

Pulley's Trustee then ceased making payments on her student loans short of the 71.81% provided

for in the plan. Pulley received her discharge in the bankruptcy case on February 3, 2012, and

the case was administratively closed on February 24, 2012.

Pulley filed the underlying post-discharge adversary proceeding in the Bankruptcy Court

after ACS, for reasons unclear from the record, sought to recoup $23,083.17 due on her BoA

student loans. In Count I, Pulley requested that the Court estop BoA, ACS, and ECMC from

collecting 71.81% of her student loans because that amount would have been paid during her

bankruptcy case if not for ACS's negligence. In Count II, Pulley sought a discharge or credit of

$5,949.03 for payments that ACS actually retained during the pendency of her bankruptcy case.

The Bankruptcy Court determined that both BoA, as holder of Pulley's student loans note, and

ECMC, as guarantor of Pulley's student loans, were bound by ACS's decision to refund

payments, and its representations to Pulley's Trustee that payments would no longer be accepted.

The Court then held that BoA, ACS, and ECMC were estopped from collecting 71.81% or

$16,154.66 of Pulley's student loans because, but for ACS's actions, that amount would have

been paid during the administration of the 60-month reorganization plan.

ECMC now appeals the Bankruptcy Court's Judgment Order equitably estopping them

from collecting $16,154.66 or 71.81% of Pulley's student loans.[2] ECMC challenges the

Bankruptcy Court's: (1) subject matter jurisdiction over Pulley's claims, post-petition interest,

---

[2] Before entry of the Judgment Order, BoA and ACS, through its successor-in-interest, entered Consent Orders explaining that they had no interest in Pulley's student loan from December 2006 until April 2012 because the loan was assigned and transferred to ECMC during this period. (Consent Orders, R. at 20–29.) The parties note, without any explanation, that they reacquired an interest in the loan from ECMC in April 2012 and held that interest until December 2013. (Id.) Both parties agreed to be bound by any judgment the Bankruptcy Court entered, including any discharge or injunction against collection of Pulley's student loan. (Id.)

and collection costs; (2) authority to equitably relieve Pulley of paying student loans without a finding of undue hardship; and (3) decision binding ECMC, not merely as assignee of BoA loans, but as guarantor of Pulley's student loans. Both ECMC and Pulley have filed memoranda supporting their respective positions (ECF Nos. 4,6,7). The Court held oral argument on April 6, 2015.

## I. BACKGROUND[3]

The facts and procedural history in this case are not disputed. Between July, 2004 and August, 2005, Pulley received $22,496.40 in student loans from BoA to pay for her education. (Proof of Claim 7-1, Ex. 2.) While BoA was the lender on each of these loans, ECMC was guarantor and ACS serviced the loans. On October 4, 2006, Pulley filed a voluntary petition for Chapter 13 bankruptcy. (Pulley's Chapter 13 Voluntary Petition, Ex. 16.) On October 30, 2006, ACS filed a proof of claim 7-1 for Pulley's student loans which represented that Pulley owed $22,496.40 toward the loans. (Proof of Claim 7-1.) The Bankruptcy Court confirmed Pulley's Chapter 13 reorganization plan on December 28, 2006 (the "Confirmed Plan"). (Ch. 13 Final Report at 1, Ex. 6.) Pursuant to the confirmed plan, Pulley was to pay all unsecured creditors, including Bank of America, 71.81% on their claims. (R. at 34.) On or about March 21, 2007, the Trustee began making payments in accordance with the plan. (Verified Statement of Trustee at ¶ 10, Ex. 7, "V.S. of Trustee.") Payments related to Pulley's BoA student loans were tendered to ACS. (*Id.*) Between March, 2007 and June, 2009, ACS retained payments from the Trustee totaling $5,949.03. (*Id.* at ¶ 11.) Several checks sent by the Trustee to ACS are included in the record, and indicate that from July, 2008 through July, 2009, ACS returned uncashed checks to

---

[3] The Court cites to the Designation of Record (ECF No. 1) filed with the Court as follows: "R. at [insert page number]." Any exhibits attached to the Record are cited with reference to their title and exhibit number. The critical facts in this case are undisputed on appeal. As the Verified of Carl M. Bates, Pulley's Chapter 13 Trustee (Verified Statement of Trustee, Ex. 7, "V.S. of Trustee"), provides the principal basis for the facts in the Bankruptcy Court's Judgment Order and the parties' briefs, the Court cites heavily to that exhibit.

the Trustee with correspondence such as "unable to locate the account with information given," "unable to locate on ACS system," and "ACS no longer services this account." (ACS Refunded Checks, Ex. 8.)

The Trustee explains that, sometime in the middle to latter part of 2009, ACS communicated to his office that it would either not accept further payments or return any future payments related to Pulley's claim. (V.S. of Trustee at ¶ 17.) Thereafter, the Trustee stopped making payments to ACS to defray Pulley's student loans and subsequently withdrew Proof of Claim 7-1 as paid in full. (*Id.* at ¶¶ 18–19.) Pulley contends that she was never made aware of the Trustee's decision to cease payments to ACS or ACS's refund of the aforementioned payments. (R. at 12.) The Trustee argues that ACS's actions were the sole reason that 71.81% or $16,154.66 was not paid on Pulley's BoA student loans during the administration of her confirmed plan. (*Id.* at ¶ 20.) Pursuant to Title 11 U.S.C. § 1328, Pulley received her discharge in the bankruptcy case on February 3, 2012.[4] (R. at 9.) Her Trustee filed his final report on February 21, 2012, certifying that the estate had been fully administered, and that all administrative matters for which a trustee is responsible had been completed. (Chapter 13 Final Report at 3.) Pulley's bankruptcy case was therefore administratively closed on February 24, 2012. (R. at 9.) At the time of filing of the immediate adversary complaint, ACS was seeking $23,083.17 in repayment for Pulley's BoA student loans.[5] (*Id.* at 13.)

The Bankruptcy Court reopened Pulley's Bankruptcy proceedings for the purpose of permitting her to file the post-confirmation adversary proceeding underlying this appeal. (*Id.* at

---

[4] Title 11 U.S.C. § 1328(a)(2) provides that, "after completion by the debtor of all payments under the plan … the court shall grant the debtor a discharge of all debts provided for by the plan" "except any debt of the kind specified in … section 523 (a)." 11 U.S.C. § 1328(a)(2). Title 11 U.S.C. § 523(a) lists student loans as one of the debts excepted from discharge. *See* 11 U.S.C. § 523(a)(8).
[5] Presumably the amount is higher than that of proof of claim 7-1 because it includes post-petition interests, which may not be included in a proof of claim, and collection costs. *See* 11 U.S.C. § 502.

4

9.) Pulley requested that the Bankruptcy Court: (1) enjoin or equitably estop BoA, ACS, and ECMC from collecting on her student loan debt based upon their purported negligence in handling tendered payments; and (2) discharge or credit Pulley $5,949.03 for the payments actually retained by ACS. (*Id.* at 13.) On October 2, 2014, the Bankruptcy Court held a trial in which ECMC did not enter an appearance and concluded that ECMC, as guarantor and successor-in-interest to BoA, was enjoined from collecting amounts in excess of $6,347.04, which accounts for the amount remaining on proof of claim 7-1 after deducting the 71.81% allotted in Pulley's confirmed plan. (*Id.* at 32–34.) The Court also found that ACS received and retained $5,949.03 from Pulley's Trustee. (*Id.* at 33.)

The central dispute before the Court is whether the Bankruptcy Court may equitably relieve or discharge Pulley's student loans without a finding of undue hardship. Pivotal questions interwoven within this controversy are: (1) the Bankruptcy Court's subject matter jurisdiction over Pulley's claims, as well as her student loans' post-petition interest and collection costs; and (2) whether ECMC is foreclosed from seeking reimbursement from Pulley as guarantor of her student loans.

## II. STANDARD OF REVIEW

The standard of review applied by this Court, albeit well-settled, depends upon whether Pulley's adversary proceeding is core or non-core. "If the proceeding is a core proceeding, the district court [ ] review[s] the bankruptcy court's factual determinations for clear error and its legal conclusions *de novo*." *Humboldt Express Inc. v. Wise Co.* (*In re Apex Express Corp.*), 190 F.3d 624, 630 (4th Cir. 1999). "If the proceeding is non-core, the district court [ ] undertake[s] a de novo analysis of both the factual findings to which [the appellee] objected and the law." *Id.*

## III. DISCUSSION

ECMC presents the following five issues on appeal:

1. Whether the Bankruptcy Court had subject matter jurisdiction to decide the amount of the student loans debt remaining after the Plaintiff's bankruptcy discharge was entered?

2. Whether the Bankruptcy Court had the authority to estop BoA, ACS, and ECMC from pursuing unpaid portions of Pulley's student loans without a finding of undue hardship?

3. Whether any portion of Plaintiff's student loans debt can be discharged without a finding of undue hardship as that term is used in 11 U.S.C. § 523(a)(8) and the cases construing the same?

4. Whether the Bankruptcy Court properly applied the doctrine of equitable estoppel to prevent ECMC from collecting the full balance of Plaintiff's student loans debt after her bankruptcy discharge?

5. Whether ECMC as guarantor of the loans was and is bound by the actions in the underlying bankruptcy case of the Lender, Defendant Bank of America, and servicing agent, Defendant ACS?

Because the Bankruptcy Court's subject matter jurisdiction and authority to estop creditors from seeking repayment of student loans are dispositive of the case, they are the focal point of the Court's analysis.

### A. Bankruptcy Court's Subject Matter Jurisdiction over Pulley's Claims

Pulley filed this adversary proceeding in response to ACS seeking $23,083.17 in student loan repayments after she received her discharge and the case was administratively closed. (R. at 13.) Pulley's Complaint, styled as a "Complaint Seeking Determination That Creditor is Enjoined or Estopped from Collecting Debt and/or Related Relief," requests that the Bankruptcy Court: (1) equitably estop BoA, ACS, and ECMC from collecting portions of her student loans that would have been paid during the pendency of the plan but for ACS's negligence; and (2) discharge or credit Pulley for those amounts actually sent by the Trustee and retained by ACS.

6

(*Id.* at 13–14.) The Bankruptcy Court did not make any jurisdictional findings save for its conclusion that "jurisdiction over th[e] matter [was appropriate], pursuant to 28 U.S.C. §[§] 1334 and 157, in that the matter ar[ose] in and/or relate[d] to Plaintiff's bankruptcy case."[6] (*Id.* at 33.)

"Federal bankruptcy courts, like the federal district courts, are courts of limited jurisdiction." *Educ. Credit Mgmt. Corp. v. Kirkland* (*In re Kirkland*), 600 F.3d 310, 315 (4th Cir. 2010) (citation and quotation marks omitted). A Bankruptcy Court's subject matter jurisdiction is "derive[d] [] from the district court," *Valley Historic Ltd. Partnership v. Bank of New York*, 486 F.3d 831, 839 n.3 (4th Cir. 2007) (citing 28 U.S.C. § 157(a), (b)(1)), and the district court's subject matter jurisdiction over bankruptcy cases is statutorily demarcated by Title 28 U.S.C. § 1334. 28 U.S.C. § 1334 provides that "[d]istrict courts have original and exclusive jurisdiction of all cases under title 11," and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(a), (b). Additionally, "[e]ach district court may provide that [ ] [cases fitting the jurisdictional statement in 28 U.S.C. § 1334] shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a). The Eastern District of Virginia has so provided. *See* Standing Bankruptcy Order (E.D. Va. August 15, 1984).

A case under Title 11 "refers merely to the bankruptcy petition itself." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225–26 n.38 (3d Cir. 2005) (citation and quotation marks omitted). "A claim 'aris[es] *under* Title 11' if it is a cause of action created by the Bankruptcy Code, and which lacks existence outside the context of bankruptcy." *In re Kirkland*, 600 F.3d at 316 (citing

---

[6] The Bankruptcy Court's inclusion of 28 U.S.C. § 157 in its jurisdictional determination is misplaced, as whether an action is core or non-core becomes relevant only after the bankruptcy court determines it has subject matter jurisdiction. *See Valley Historic Ltd. Partnership v. Bank of New York*, 486 F.3d 831, 839 n.3 (4th Cir. 2007); *see also Stern v. Marshall*, 564 U.S. ——, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011) (explaining that "Section 157['s] allocat[ion] [of] the authority to enter final judgment between the bankruptcy court and the district court…does not implicate questions of subject matter jurisdiction."). Although the Bankruptcy Court does not state whether Pulley's claims are core or non-core, this Court presumes that the Bankruptcy Court determined the claims were core, as it entered a final judgment in the matter.

*Aheong v. Mellon Mortgage Co.* (*In re Aheong*), 276 B.R. 233, 242–46 (B.A.P. 9th Cir. 2002))

(emphasis added).  A claim "'arises *in* Title 11' when it would have no practical existence but for

the bankruptcy." *Valley Historic Ltd. Partnership*, 486 F.3d at 835 (citations and internal

quotation marks omitted) (emphasis added).  Lastly, in the post-confirmation context, a claim is

"related to a case under title 11" where "there is a *close nexus* to the bankruptcy plan or

proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." *Valley Historic*

*Ltd. Partnership*, 486 F.3d at 836–37 (quoting *J. Louis Binder v. Price Waterhouse & Co.* (*In re*

*Resorts Int'l, Inc.*), 372 F.3d 154, 166–67 (3d Cir. 2004)) (emphasis added).

     Pulley's scant briefing of the Bankruptcy Court's subject matter jurisdiction provides

limited guidance, as it merely notes that the Bankruptcy Court could exercise subject matter

jurisdiction over the post-petition interest and collection costs because "those items were so

bound up with the sum the Bankruptcy Court found would have been paid on the student loans

but for the conduct [ ] [of the creditors]."[7]  (Appellee's Am. Br. at 10, ECF No. 8.)  ECMC

argues that the Bankruptcy Court could not exercise subject matter jurisdiction over Pulley's

action because "Pulley's [bankruptcy] case has been fully administered, a discharge [ ] received

and the case closed."[8]  (Appellant's Br. at 14, ECF No. 4.)

     As *Kirkland* appears to indicate, and the Third Circuit has held, the Court must

determine whether the Bankruptcy Court properly exercised jurisdiction over each claim, and

---

[7] As an initial matter, the Fourth Circuit's decision in *Kirkland* forecloses Pulley's argument that the Bankruptcy Court had subject matter jurisdiction to determine her post-petition interest and collection costs.  Pulley attempts to meaningfully distinguish her case utilizing the "bound up" argument, but instead draws a distinction without a difference.  *Kirkland* stands on all fours for purposes of the Bankruptcy Court's jurisdiction over post-petition interest and collection costs.  *In re Kirkland*, 600 F.3d at 314–18.

[8] To the extent that ECMC's argument here is that the Bankruptcy Court could not exercise subject matter jurisdiction merely because Pulley's bankruptcy case was "not only confirmed, but fully administered, a discharge obtained[,] and the case closed," it is unavailing.  (Appellant's Reply Br. at 7, ECF No. 7.)  Title 11 U.S.C. §§ 350(a), (b) expressly provide that even "[a]fter an estate is fully administered" and a trustee discharged, "[a] case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause."  11 U.S.C. §§ 350(a), (b).  ECMC does not appeal the Bankruptcy Court's discretion or decision to reopen Pulley's bankruptcy case.

whether the claims are core or non-core. *See In re Kirkland*, 600 F.3d at 316 (clarifying that the district court's jurisdictional analysis "seem[ed] to focus on jurisdiction to adjudicate the dischargeability of the principal of the student loans debt," but "offered only a conclusory statement directed to the separate matter of subject matter jurisdiction over the issues of post-petition interest and collection costs"); *see, e.g., Halper v. Halper*, 164 F.3d 830, 839 (3d Cir. 1999) (reiterating that the Third Circuit has adopted "claim-by-claim approach" to core/non-core distinction); *but cf.* 11 U.S.C. §1334 (providing that jurisdiction is over "all civil *proceedings* arising under title 11, or arising in or related to cases under title 11.") (emphasis added).

### *i.  Count I Arises In and is Related to Pulley's Bankruptcy's Case*

The Fourth Circuit has explained that "[a] proceeding or claim 'aris[es] in' Title 11 [where it is] [ ] not based on any right expressly created by Title 11, but nevertheless, would have no existence outside of the bankruptcy." *Valley Historic Ltd. Partnership*, 486 F.3d at 835 (citing *Grausz v. Englander*, 321 F.3d 467, 471 (4th Cir. 2003)) (internal citation and quotation marks omitted). Stated another way, "a controversy arises in Title 11 when it would have no practical existence but for the bankruptcy." *Id.* (internal citations and quotation marks omitted).[9]

Pulley's equitable estoppel claim does not have any practical existence but for or outside her bankruptcy, as the *sine qua non* of her claim is the Bankruptcy Court's confirmed plan. That is, the Bankruptcy Plan provided for a pro rata distribution of 71.81% to all unsecured creditors, including BoA, during the pendency of the plan. Pulley's equitable estoppel claim focuses on

---

[9] Some bankruptcy courts in this district, *see, e.g., Suntrust Bank v. Roberson (In re Baseline Sports, Inc.)*, 393 B.R. 105, 122–26 (Bankr. E.D. Va. 2008), have interpreted *Valley Historic* as rejecting the "but for" test delineated in *Grausz* and *Bergstrom*, and adopting whether a claim "would have an existence outside of bankruptcy" as the touchstone of a bankruptcy court's "arising in" jurisdictional inquiry. *Valley Historic Ltd. Partnership*, 486 F.3d at 836. Such a reading is unreasonable in light of the Fourth Circuit's explicit adoption of the "but for" phraseology in its explication of the law. The Court is not inclined to read *Valley Historic* as overturning those holdings. Instead, *Valley Historic* merely recognized and reiterated the Fourth Circuit's understanding that "arising in" jurisdiction is not applicable where a claim bears only a coincidental relationship to the bankruptcy and "would have existed whether or not the Debtor filed bankruptcy." *Id.*

whether this portion of the student loans debt should be paid to creditors who did not receive their pro rata share as a result of their alleged negligence during the administration of the confirmed plan. These facts are noticeably different than those faced by the Fourth Circuit in *Valley Historic*. In *Valley Historic*, the Fourth Circuit held that the debtor's tortious interference and breach of contract claims bore only a coincidental relationship to the confirmed plan because the breach of contract claim predated the bankruptcy filing and the tortious interference claim, merely complicated the administration of the bankruptcy case. *Valley Historic Ltd. Partnership*, 486 F.3d at 836. In other words, these claims "would have existed whether or not the Debtor filed bankruptcy." *Id.* To be clear, the Court is mindful that the debt underlying Pulley's student loans predates her bankruptcy petition, and that her claim arising during the pendency of a bankruptcy is alone insufficient, but, here, Pulley's claim is inexorably linked to her bankruptcy case. Pulley's claim is more analogous to that found in *Grausz* where the debtor brought a malpractice claim after receiving negligent advice from his attorney concerning the bankruptcy process. *Grausz*, 321 F.3d at 470–72. The *Grausz* court explained that "whether [the malpractice claim] belongs to him or the estate [the lawyer] committed malpractice in [the debtor's] bankruptcy case." *Id.* at 472.

Pulley's equitable estoppel argument targets the portions of her student loans slated for distribution by the Bankruptcy Court, and not the mere complication caused to the administration of her estate by a lawsuit tangentially related to the bankruptcy proceedings. *See Valley Historic Ltd. Partnership*, 486 F.3d at 834–36 (explaining that tortious interference claim by debtor against lender that was premised upon actions extraneous to the bankruptcy did not arise in debtor's bankruptcy case). The alleged inaction by ACS did not merely complicate Pulley's bankruptcy case, but rather went to the essence of the Bankruptcy Court's confirmed plan which

10

called for a pro-rata distribution of 71.81% to all unsecured creditors. Therefore, Pulley's claim would not exist had she not filed her bankruptcy.

Assuming *arguendo* that the genesis of the Bankruptcy Court's subject matter jurisdiction over Pulley's claim "does not arise in" Pulley's bankruptcy case, her claim surely has a sufficiently close nexus to the bankruptcy case that it satisfies the Bankruptcy Court's "related to jurisdiction." ECMC incorrectly analyzes the Bankruptcy Court's related to jurisdiction in this post-confirmation context utilizing the pre-confirmation benchmark, namely whether "*the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy*." *Valley Historic Ltd. Partnership*, 486 F.3d at 836 (internal citations and quotation marks omitted) (emphasis in original). In the post-confirmation framework, however, "the essential inquiry" is "whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." *Id.* (quoting *In re Resorts Int'l Inc.*, 372 F.3d at 166). "Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Id.* at 836–37 (citation omitted). Without this close nexus analysis, "'related to' jurisdiction would extend beyond the limited jurisdiction conferred upon bankruptcy courts in the post-confirmation context." *Id.* at 837 (citing *In re Resorts Int'l, Inc.*, 372 F.3d at 164–69).

In *Valley Historic*, the Court held that the debtor's breach of contract and tortious interference lawsuits were unrelated to debtor's bankruptcy, because the debtor's "[p]lan made no provision for the use of any recovery from the adversary proceeding" and the debtor paid all creditors prior to commencing the adversary proceeding. *Id.* at 837. Similarly, in *Kirkland* the Fourth Circuit reasoned that because the debtor was precluded from including post-petition

11

interest in a proof of claim, the debtor's adversary proceeding pertaining to post-petition interest lacked the requisite "close nexus" to the bankruptcy proceeding. *See In re Kirkland*, 600 F.3d at 316–18.

Distinguishable from the facts before the Fourth Circuit in *Valley Historic* and *Kirkland*, Pulley's confirmed plan: (1) could, and did, include a proof of claim for her student loans from BoA;[10] and (2) expressly delineated the pro rata share to be paid on the student loans during the pendency of the plan. That Pulley's student loans are ultimately unaffected by the bankruptcy process and remain a personal obligation of Pulley after the bankruptcy, does not obviate the critical fact for jurisdictional purposes that Pulley's claim is premised upon the Bankruptcy Court's confirmed plan.[11] *See, e.g., Donaldson v. Bernstein*, 104 F.3d 547, 552–53 (3d Cir. 1997) (upholding bankruptcy court jurisdiction because the trustee through the lawsuit was "basically ... seeking to carry out the intent of the reorganization plan."). Furthermore, Pulley's claim is related only to those portions of the student loans that were to be paid during the pendency of the confirmed plan. The fatal flaw in *Kirkland* was not merely that post-petition interest went through the bankruptcy unaffected, but that this interest was expressly disallowed from being submitted in the proof of claim process (*i.e.* bankruptcy administration).

Lastly, Pulley's equitable estoppel claim affects one or more of the "implementation,

---

[10] A student loan creditor may file its claim with the bankruptcy estate only for prepetition interest and principal balance. *See Kielisch v. Educ. Credit Mgmt. Corp. (In re Kielisch)*, 258 F.3d 315, 325 (4th Cir. 2001). There is no evidence that the Bankruptcy Court included any unmatured interest in BoA's proof of claim.

[11] As illustrated *infra*, the Court does not determine or take a peek at the merits of these claims to determine whether they satisfy the Bankruptcy Court's subject matter jurisdiction. The purpose of subject matter jurisdiction is to determine whether the Court may hear the merits of the party's claims, not to determine those claims' viability. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) (explaining that "[j]urisdiction ... is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.")

consummation, execution, or administration of the confirmed plan."[12] *Valley Historic Ltd. Partnership*, 486 F.3d at 836–37. Stated another way, although Pulley's case was administratively closed prior to this action, her confirmed plan was never fully administered because she did not, unbeknownst to her, actually make all of the required payments under her bankruptcy plan. *See, e.g., Educ. Credit Mgmt. v. Kirkland, rev'd on other grounds*, 402 B.R. 177, 185 (W.D. Va. 2009) (explaining that there was a "conceivable bankruptcy administration purpose to be served" where debtor, whose bankruptcy case was officially closed, had not *actually* paid all of her creditors because of her Trustee's oversight) (emphasis added). In other words, her Trustee's decision to cease making payments to ACS in accordance with the confirmed plan, and withdraw the claim as paid in full because of ACS's actions plainly appear to go to the heart of the full administration and execution of the confirmed plan.

### ii. Count II Arises Under Title 11

"A claim 'aris[es] under Title 11' if it is a cause of action created by the Bankruptcy Code, and which lacks existence outside the context of bankruptcy." *In re Kirkland*, 600 F.3d at 316 (citation omitted). Neither party offered, nor did the Bankruptcy Court develop, findings regarding subject matter jurisdiction over Count II of Pulley's Complaint which seeks a discharge or credit of those amounts actually sent by the Trustee and received by ACS. Although Pulley does not style her adversary complaint or Count II as one seeking a discharge, Count II quite plainly invokes the Bankruptcy Court's jurisdiction to determine dischargeability, and does so in an adversary proceeding.[13] Dischargeability is a cause of action which 'arises

---

[12] As the Third Circuit clarified in *In Re Resorts*, although "[a]t the most literal level, it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute because the debtor's estate ceases to exist once confirmation has occurred," "courts do not usually apply the [ ] test so literally as to entirely bar post-confirmation bankruptcy jurisdiction." *In re Resorts Int'l Inc.*, 372 F.3d at 168.

[13] To discharge student loan debt, a debtor must file an adversary complaint, *see* 11 U.S.C. 7001(6), and demonstrate that payment of the debt would constitute an undue hardship under 11 U.S.C. § 523(a)(8).

under' the Bankruptcy Code pursuant to § 523 of the Bankruptcy Code. *See* 11 U.S.C. §§ 523(a)(8); *see also In re Aheong*, 276 B.R. at 244 (9th Cir. BAP 2002). "Because [Pulley] sought a determination that [a portion of] the principal obligation had been discharged during her bankruptcy proceeding, the bankruptcy court had jurisdiction under § 1334." *Kirkland*, 600 F.3d at 316.

Finding that the Bankruptcy Court had subject matter jurisdiction over Pulley's claims, the Court will turn to whether Pulley's claims are core or non-core. *See Valley Historic Ltd. Partnership*, 486 F.3d at 839 n.3.

## B. Whether Pulley's Claims are Core or Non-Core

Whether a claim is core or non-core not only determines the standard of review employed by the district court, the distinction also governs the bankruptcy court's authority to enter a final judgment. While a bankruptcy court "may [conclusively] decide core bankruptcy claims, which include [ ] [the claims listed in] 28 U.S.C. § 157(b)(2)[][,]" "it cannot finally resolve [non-core claims] and must instead submit proposed findings of fact and conclusions of law to the district court." *Moses v. CashCall, Inc.*, 781 F.3d 63, 70 (4th Cir. 2015).

The Bankruptcy Court did not make a finding that Pulley's claims were core or non-core, and ECMC does not raise the issue on appeal. Nevertheless, ECMC does not dispute that service was properly effected or that it had notice of Pulley's adversary proceeding. ECMC made the apparent tactical decision not to enter an appearance in Pulley's adversary proceeding. Although their nonappearance and failure to object does not itself undermine ECMC's appeal, it is well-settled that a failure to object to a bankruptcy court's *statutory* authority to enter a final judgment provides implied consent to that bankruptcy court's statutory authority or waiver of that issue on appeal. *See Stern*, 131 S. Ct. at 2607–08 (holding that creditor's "conduct before the Bankruptcy

Court," namely that he "repeatedly stated to the Bankruptcy Court that he was happy to litigate there," demonstrated "consent[] to that court's resolution of his [ ] claim (and forfeit[ure] [of] any argument to the contrary"); *see also Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751, 762 (7th Cir. 2013) ( "Unlike the murky issue of waiver surrounding the bankruptcy court's constitutional authority, it is clear that a party can waive an argument concerning the core/noncore status of a claim under § 157."); *Johnson v. Finnman (In re Johnson)*, 960 F.2d 396, 403 (4th Cir. 1992) (holding that "a party can impliedly consent to entry of judgment by the bankruptcy court in a non-core related matter."). Accordingly, the Court finds that ECMC impliedly consented to the bankruptcy's statutory authority to enter a final judgment.

In light of the Supreme Court's holding in *Stern*, however, the Bankruptcy Court's statutory authority does not end the core/non-core inquiry. Although the *Stern* court explained that its decision "d[id] not change all that much," the decision made clear that whether a bankruptcy court may enter a final judgment does not necessarily turn on whether the action is statutorily core, *i.e.*, one of those listed in §157(b)(2). *Stern*, 131 S. Ct. at 2608–09 (finding that "[a]lthough [ ] § 157(b)(2)(C) permit[ted] the Bankruptcy Court to enter final judgment on [the debtor's] counterclaim, Article III of the Constitution d[id] not.") Before a bankruptcy court can enter a final judgment on a statutorily core claim, it must also determine that the claim is constitutionally core. *Id.*; *see also CashCall, Inc.*, 781 F.3d at 70 (explaining that *Stern* "modified the[] statutory assignments of responsibility [by] holding that Article III of the Constitution prohibits bankruptcy courts from issuing final orders regarding statutorily core claims unless they [ ] [are constitutionally core]").

Like the issue of statutory authority, ECMC's tactical decision not to enter an appearance in Pulley's adversary proceeding presents the issue of whether it has either waived any argument

15

against, or impliedly consented to, the Bankruptcy Court's constitutional authority to enter a

final judgment. The Fourth Circuit has not explicitly decided the issue, and the courts of appeals

that have done so are divided.[14]  As a result, the Supreme Court granted *certiorari* on the issue

and heard argument in January. *Wellness Int'l Network Ltd.*, 727 F.3d 751, *cert. granted in part*,

— U.S. ——, 134 S. Ct. 2901, — L. Ed. 2d —— (2014) (granting *certiorari* on issue of

"whether Article III permits the exercise of the judicial power of the United States by the

bankruptcy courts on the basis of litigant consent, and if so, whether implied consent based on a

litigant's conduct is sufficient to satisfy Article III."). The Court need not determine that issue

here, and will simply consider whether Pulley's claims are constitutionally core.

Claims that "stem [ ] from the bankruptcy itself or would necessarily be resolved in the

claims allowance process" are constitutionally core. *CashCall, Inc.*, 781 F.3d at 71 (quoting

*Stern*, 131 S. Ct. at 2618).  "Where a final ruling is a 'central part of the restructuring of the

debtor-creditor relationship,' no Article III powers are exercised." *Harvey v. Dambowsky (In re*

*Dambowsky)*, 526 B.R. 590, 604 (Bankr. M.D.N.C. 2015) (quoting *Bakst v. Smokemist, Inc. (In*

*re Gladstone)*, 513 B.R. 149, 158 (Bankr. S.D. Fla. 2014) (citing *Stern*, 131 S. Ct. at 2617); *see*

*also In re Apex Express Corp.*, 190 F.3d at 632 (extrapolating from Supreme Court decisions,

specifically *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 79, n. 31,

102 S. Ct. 2858, 73 L. Ed. 2d 598 (1982) (plurality opinion) and *Granfinanciera, S.A. v.*

---

[14] Of the four courts of appeals to directly decide the issue, only the Ninth Circuit has held that waiver or consent is permissible when considering the bankruptcy court's constitutional authority. *Compare Executive Benefit's Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.)*, 702 F.3d 553, 561 (9th Cir. 2012), *aff'd on other grounds*, – — U.S. ——,134 S. Ct. 2165, 189 L. Ed. 2d 83 (2014), *with Wellness Int'l Network, Ltd.*, 727 F.3d at 762–66, *and In re BP RE, L.P.*, 735 F.3d 279 (5th Cir. 2013), *and Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012). The critical distinction underlying this circuit split is whether the Article III interests protected by the *Stern* court, namely "the authority of the Judicial Branch," is materially different than the interests protected by 28 U.S.C. § 157(c)(2) such that a party may not consent to the bankruptcy court's authority or waive the issue by not objecting. *Stern*, 131 S. Ct. at 2620. Stated more succinctly, does "the allocation of authority between bankruptcy courts and district courts [ ] implicate[s] structural interests" rather than a personal right of the litigant such that it is not waivable? *In re Bellingham Ins. Agency, Inc.*, 702 F.3d at 567 n.9.

*Nordberg*, 492 U.S. 33, 109 S. Ct. 2782, 106 L. Ed. 2d 26 (1989), that "the core/non-core distinction should depend upon the connection the claim has to [the] public right" at the "core of the federal bankruptcy power," namely "the restructuring of debtor-creditor relations.")

The Bankruptcy Court's constitutional authority to enter a final judgment over Pulley's dischargeability claim is without question. "Congress has plenary power to regulate the bankruptcy discharge—a legislative status in an area unknown to the common law—Congress can generally delegate the implementation of the discharge to non-Article III judges." *Deitz v. Ford (In re Deitz)*, 469 B.R. 11, 26 (9th Cir. BAP 2012), *aff'd*, 760 F.3d 1038 (9th Cir. 2014) (Markell, J., concurring); *see also Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363–64, 126 S. Ct. 990, 163 L. Ed. 2d 945 (2006) (recognizing that a discharge is among the "[c]ritical features" of a bankruptcy proceeding); *Valley Historic Ltd. Partnership*, 486 F.3d at 836 ("the very purpose of bankruptcy is to discharge or restructure the debt that has caused the bankruptcy"); *Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 312 (Bankr. N.D. Tex. 2011) ("[T]here can be little doubt that [a bankruptcy court], as an Article I tribunal, has the constitutional authority to hear and finally determine what claims are non-dischargeable in a bankruptcy case.").

Unlike Pulley's dischargeability claim, Pulley's equitable estoppel argument is premised upon Virginia common law and would not necessarily be resolved in the claims allowance process. Rather, Pulley's equitable estoppel claim "involves the most prototypical exercise of judicial power: the entry of final, binding judgment by a court with broad substantive jurisdiction, on a common law cause of action, when the action neither derives from nor depends upon any agency regulatory regime." *See Stern*, 131 S. Ct. at 2607–08. Although Pulley's equitable estoppel argument flows from her creditor's actions and went to the heart of the confirmed plan, the claim cannot be said to invoke any "public rights" merely because the

17

confirmed plan provided for pro rata distributions. *See, e.g.*, *In re Dambowsky*, 526 B.R. at 595 ("Although they are related concepts [ ], the scope of [] bankruptcy courts' subject matter jurisdiction, their statutory authority to hear and/or determine any particular matter, and their constitutional authority to do so, each are delineated by different statutory, constitutional, and/or judicial authorities."); *cf. Frisia Hartley, LLC v. Wells Fargo Bank, N.A. (In re Talsma)*, 509 BR. 535, 544 (Bankr. N.D. Tex. 2014) (holding that whether debtor's claims "hinge on whether [creditor] breached the Plan and Plan Documents" the claim is constitutionally core because "construction of the Plan and Plan Documents stems directly from the bankruptcy plan itself.")

Here, the Bankruptcy Court inappropriately entered a final judgment on a *Stern* claim.[15] *See Executive Benefits Ins. Agency v. Arkison*, —— U.S. ——, 134 S. Ct. 2165, 2172–73, 189 L. Ed. 2d 83 (2014) (explaining that "a *Stern* claim may not be adjudicated to final judgment by the bankruptcy court, as in a typical core proceeding."). The *Arkison* court held, however, that where a *Stern* claim "fits comfortably within the category of claims governed by §157(c)(1)," a section reserved for non-core claims, a bankruptcy court is nevertheless permitted to "submit proposed findings of fact and conclusions of law to the District Court" to be reviewed *de novo*. *Arkison*, 134 S. Ct. at 2173. Accordingly, the Court must determine whether Pulley's equitable estoppel claim fits comfortably within the category of claims "that [are] otherwise related to a case under title 11." 28 U.S.C. §157(c)(1). Considering the Court's conclusion in part "A., *i.*" that Pulley's equitable estoppel claim is one that is "related to" her bankruptcy case, the Court concludes that the claim fits comfortably within the category of claims governed by §157(c)(1).

Where, as here, the Bankruptcy Court has entered an invalid final judgment on a *Stern* claim, the district court may "relabel the bankruptcy order as mere proposed findings of fact and

---

[15] As explained earlier, the Court proceeds on the assumption that the claim is statutorily core because of ECMC's implied consent.

conclusions of law" and conduct *de novo* review. *Arkison*, 134 S. Ct. at 2174–75 (recognizing that "any error" caused by the bankruptcy court's entry of an invalid final judgment is cured by a district court's *de novo* review of that judgment, and providing tacit approval of a district courts ability to "relabel" the bankruptcy order as proposed findings of fact and conclusions of law); *see also Galaz v. Galaz (In re Galaz)*, 765 F.3d 426 (5th Cir. 2014) (vacating and remanding to *district court* "for *de novo* review of the bankruptcy court's decision as recommended findings and conclusions.").

Accordingly, the Court will treat the Bankruptcy Court's decision on Pulley's equitable estoppel claim as proposed findings of fact and conclusions of law to be reviewed *de novo*.[16]

### C. Bankruptcy Court's Power to Grant Equitable Relief of Pulley's Student Loans

The factual basis of Pulley's equitable estoppel claim is not in dispute. On or about March 21, 2007, the Trustee began making payments in accordance with the plan. (V.S. of Trustee at ¶ 10.) Payments related to Pulley's student loans were tendered to ACS. (*Id.*) Checks provided in the record indicate that from July, 2008 through July, 2009, ACS returned uncashed checks to the Trustee with correspondence such as "unable to locate the account with information given," "unable to locate on ACS system," and "ACS no longer services this

---

[16] For purposes of the Court's analysis in part "C.", the Court will focus on Pulley's equitable estoppel claim, as the Judgment Order disposes of 71.81% of Pulley's student loan debt based upon Pulley's equitable estoppel claim. Nevertheless, the Bankruptcy Court's Judgment Order does state, and ECMC acknowledges in its brief, that ACS did retain $5,949.03. (Appellant's Br. at 4.) The Court is not convinced, however, that the Bankruptcy Court may discharge even this portion of Pulley's student loan debt without a showing of undue hardship. Numerous bankruptcy courts have sought to wield equity powers to grant a partial discharge under 11 U.S.C. § 105(a), which permits bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Every court of appeals to consider the issue, however, has held that § 105(a) does not permit the bankruptcy court to grant a partial discharge of a student loan debt without a finding of undue hardship. *See Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 412 F.3d 1200, 1206 (10th Cir. 2005); *Miller v. Pa. Higher Educ. Assistance Agency (In re Miller)*, 377 F.3d 616, 623 (6th Cir. 2004); *Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman)*, 325 F.3d 1168, 1175 (9th Cir. 2003); *Hemar Ins. Corp. of Am. v. Cox (In re Cox)*, 338 F.3d 1238, 1243 (11th Cir. 2003).

account." (ACS Refunded Checks, Ex. 8.) Sometime in middle to latter part of 2009, ACS

communicated to the Trustee's office that it would either not accept further payments or return

any future payments related to Pulley's claim. (V.S. of Trustee at ¶ 17.) Thereafter, the Trustee

ended payments to ACS and withdrew the Proof of Claim as paid in full. (*Id.* at ¶¶ 18-19.) The

Bankruptcy Court determined that Pulley established all the elements of an equitable estoppel

claim, and estopped ACS, ECMC, and BoA from receiving the 71.81% of Pulley's student

loans.[17]

Although the Bankruptcy Court could exercise subject matter jurisdiction over Pulley's

claims, the contours of its decision are confined to the provisions of the Bankruptcy Code and

related jurisprudence. "Equitable considerations [do not] permit a bankruptcy court to

contravene express provisions of the Code." *Law v. Siegel*, —— U.S. ——, 134 S. Ct. 1188,

1197, 188 L. Ed. 2d 146 (2014); *see also Norwest Bank Worthington v. Ahlers*, 485 U.S. 197,

206, 108 S. Ct. 963, 99 L. Ed. 2d 169 (1988) ("[W]hatever equitable powers remain in the

bankruptcy court must and can only be exercised within the confines of the Bankruptcy Code.").

With this maxim in mind, the Court must now decide if the Bankruptcy Court possessed the

statutory authority to estop the student loan creditors from seeking repayment of student loans.

The statutory framework and policy rationale underlying dischargeability and student

---

[17] Both ECMC and Pulley agree that a guarantor has two different "buckets of rights," one as assignee of the lender and other separate and distinct rights as guarantor of the loan. *See Alfes v. Educ. Credit Mgmt. Corp. (In re Alfes)*, 709 F.3d 631, 636 (6th Cir. 2013) (holding that "default judgment against [lender] limits [guarantor's] claim as *assignee* of the Note, [but] [] has no effect on its separate and distinct rights as guarantor."); *see also Austin v. UMPAC/MHEAA (In re Austin)*, 294 B.R. 258, 260 (E.D. Va. 2003) (acknowledging that "a [debtor's] obligation to the noteholder and the obligation that may arise to a guarantor upon payment of the guarantee are two separate and distinct obligations."); *United States v. Eckard*, 200 B.R. 152, 154 (Bankr. N.D. Ohio 1996) (same). These decisions are persuasive. The Bankruptcy Court's decision that ECMC, as guarantor, is precluded from recovering more than $6,347 disregards its separate and distinct right as guarantor of the loan which accrues upon payment of the guarantee.

loans debt is instructive.[18] "Once a debtor has satisfied his payments under the confirmed plan, the bankruptcy court grants the debtor a discharge of all debts provided for by the plan, *see* 11 U.S.C.A. § 1328(a), [except for] those debts which are nondischargeable under 11 U.S.C.A. § 523(a) [, a list which includes student loans]." *Ekenasi v. Educ. Res. Inst. (In re Ekenasi)*, 325 F.3d 541, 545 (4th Cir. 2003). Because student loans are non-dischargeable, the debtor remains personally responsible for them after the bankruptcy. *Id.* (citations omitted). This reality has led the Fourth Circuit to explain that student loans "pass through the bankruptcy unaffected." *Id.* (citing *In re Kielisch*, 258 F.3d at 320). To discharge student loans, a generally non-dischargeable debt, a student loans debtor must demonstrate that payment for the loans would constitute an undue hardship.[19] *See* 11 U.S.C. § 523(a)(8).

More critical than the statutory framework is the policy rationale underlying the undue hardship requirement. This "heightened" requirement, the Fourth Circuit has remarked, "protects the integrity of the student-loans program" and "prevent[s] debtors from easily discharging their debts at the expense of the taxpayers who made possible their educations." *Educational Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 399–401 (4th Cir. 2005). Congress did not merely intend that student loans debtors "receive the major benefits of a taxpayer-funded education," but also the responsibility "to repay them in all but the most dire circumstances." *Id.* at 399; *see also Tennessee Student Assistance Corp. v. Hornsby (In re*

---

[18] Title 11 U.S.C. § 523(a)(8) provides that, "[a] discharge under section ... 1328(b) of this title does not discharge an individual debtor from any debt" for "an educational benefit ... loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution []" or "an obligation to repay funds received as an educational benefit, scholarship, or stipend" unless excepting such debt from discharge ... would impose an undue hardship on the debtor and the debtor's dependents." "Educational Credit Management Corporation (ECMC), is a non-profit corporation that administers government-guaranteed student loans." *In re Frushour*, 433 F.3d at 399–401.

[19] To demonstrate undue hardship, "the debtor must establish[:] (1) that he cannot maintain a minimal standard of living for himself and his dependents, based upon his current income and expenses, if he is required to repay the student loans; (2) that additional circumstances indicate that his inability to do so is likely to exist for a significant portion of the repayment period of the student loans; and (3) that he has made good faith efforts to repay the loans." *In re Ekenasi*, 325 F.3d at 545 (citation omitted).

21

*Hornsby*), 144 F.3d 433, 436–37 (6th Cir. 1998) (recognizing that the undue hardship requirement "was enacted to prevent indebted college or graduate students from filing for bankruptcy immediately upon graduation, thereby absolving themselves of the obligation to repay their student loans.").

Attempting to distinguish the relief awarded, Pulley argues that the Bankruptcy Court did not enter a discharge, but instead merely estopped ECMC from pursuing the 71.81% of the student loans that would have been paid but for ACS's negligence. At first glance, Pulley advances a seductive line of reasoning—that the undue hardship finding is only required where a discharge is expressly requested as opposed to where, as here, the debtor seeks relief from payment of a non-dischargeable debt on the basis of equitable estoppel. Pulley's argument is unconvincing. She is correct that the Bankruptcy Court technically entered a Judgment Order, as opposed to a discharge order, and only indirectly invoked "dischargeability" when explaining that the amount remaining after providing relief for the 71.81% called for under the confirmed plan was "non-dischargeable." (R. at 34.) Irrespective of the descriptive label, this Court must focus on the legal effect of the Bankruptcy Court's actions.

The Bankruptcy Code provides, in pertinent part, that a discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived." 11 U.S.C. § 524(a)(2). The Bankruptcy Court's Judgment Order, in effect, was the functional equivalent of a discharge, and there is no statutory basis by which the Bankruptcy Court, or any court for that matter, can equitably estop a creditor

from reaching non-dischargeable student loans.[20]   *See, e.g., Law v. Siegel*, 134 S. Ct. at 1198

(explaining that "it is not for courts to alter the balance struck by the [bankruptcy] statute"); *see*

*also In re Alderete*, 412 F.3d at 1206 ("To allow the bankruptcy court, through principles of

equity, to grant any more or less than what the clear language of § 523(a)(8) mandates would be

tantamount to judicial legislation and is something that should be left to Congress, not the

courts.") (quoting *In re Cox*, 338 F.3d at 1243).   If such a path existed, debtors "would, in

essence, [be] permit[ted]" "to accomplish indirectly what they could not accomplish directly

under the plain language of [the Bankruptcy Code]." *In re Kielisch*, 258 F.3d at 324.   Even if,

as Pulley contends, ECMC did not provide notice of transfer after proof of claim 7-1 was

assigned to it, Federal Rule of Bankruptcy Procedure 3001(e)(2), which provides for such notice,

is not a basis for precluding a student loans creditor from collecting a debtor's student loans.[21]

As several bankruptcy courts have observed, even where a student loans creditor acts inequitably

in pursuing a debtor's student loans debt within the bankruptcy process, that creditor is not

foreclosed from pursuing the student loans because they are nondischargeable debts. *See In re*

*Loving*, 269 B.R. 655 (Bankr. S.D. Ind. 2001) (explaining that despite "sympathizing" with

debtor, student loans creditor who waited years to pursue debt was not estopped from doing so);

*see also In re Sprolito*, 359 B.R. 423, 428–29 (Bankr. D.P.R. 2006) (citation omitted) (same).

Such a result, while perhaps inequitable, is fitting where Congress expressly intended that

students not merely "receive the major benefits of a taxpayer-funded education," but also the

---

[20] Notably, 11 U.S.C. 1328(b)(1) provides for a discharge to a debtor, such as Pulley, who has not completed payments under the plan but where failure to complete such payments are due to circumstances for which the debtor should not justly be held accountable. *See* 11 U.S.C. 1328(b)(1). This section does not, however, provide relief for those student loans or other debts specified in § 523(a). *Id.*

[21] As the Fourth Circuit noted, albeit in an unpublished opinion, "the bankruptcy rules, [*see*] 28 U.S.C. § 2075, state that '[s]uch rules shall not abridge, enlarge, or modify any substantive right.'" *In re Arc Energy Corp.*, 122 F.3d 1060 (4th Cir. 1997) (unpublished) (internal citation omitted).

responsibility "to repay them in all but the most dire circumstances."[22] *In re Frushour*, 433 F.3d at 399.

## IV. CONCLUSION

Based on the foregoing analysis, the Court will Vacate and Remand the Bankruptcy Court's Order equitably estopping ECMC from enforcing its guarantee and collecting payment on Pulley's student loans debt without a particularized finding of undue hardship. The Bankruptcy Court is instructed to dismiss Pulley's equitable estoppel claim thereby reinstating her student loans absent findings consistent with this Court's opinion. Additionally, on remand, the Bankruptcy Court may enter final judgment on Count II consistent with this Court's opinion.

An appropriate Order will accompany this Memorandum Opinion.

/s/
_____
Henry E. Hudson
United States District Judge

Date: April 30 2015
Richmond, VA

---

[22] For these same reasons, the Court is skeptical of Pulley's use of equitable estoppel in this case. First, despite Pulley's insistence, Virginia does not recognize equitable estoppel as a cause of action. *See, e.g., Parker v. Westat, Inc.*, 301 F.Supp.2d 537, 544 (E.D. Va. 2004) (recognizing that in Virginia, "there is no recognized cause of action for [equitable] estoppel," and the doctrine is usually asserted as a "shield" rather than a "sword."); *Nasser v. WhitePages, Inc.*, No. 5:12cv00097, 2014 WL 55783, at *3 (W.D. Va. Jan. 7, 2014) (The plaintiff "cannot assert [an] equitable estoppel claim because, although the doctrine is recognized in Virginia, it is not a cause of action but rather an affirmative defense.").